# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 14, 2020

Lyle W. Cayce
Clerk

No. 19-60719

Lashawnda Brown,

*Plaintiff—Appellant*,

*versus*

Wal-Mart Stores East, L.P.; Amanda Payton; John and Jane Does I-X,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:18-CV-243

Before Clement, Southwick, and Higginson, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

Plaintiff-Appellant Lashawnda Brown, an assistant manager at Wal-Mart Stores East, L.P. (Wal-Mart), was fired after she reported her supervisor, Aurelio Quinn, for sexually harassing other Wal-Mart employees. According to Wal-Mart, Brown was terminated because she violated Wal-Mart's Investigation and Detention of Shoplifters Policy (AP-09). Brown sued Wal-Mart for retaliation and wrongful termination and Amanda Payton, another assistant manager at Wal-Mart, for tortious interference with an employment contract. The district court granted summary judgment for the

defendants, dismissing all of Brown's claims. Brown appeals the district court's dismissal of her Title VII retaliation claim against Wal-Mart. We AFFIRM.

I

In 2014, Brown began working as an assistant manager at the Wal-Mart Neighborhood Market in Biloxi, Mississippi. She reported to the store manager, Quinn, who began working at the store in July 2016.

In December 2016, Brown began hearing rumors about Quinn paying another employee, S.M., for sex. That employee never spoke to Brown about the incident directly, but two other employees, Amanda Payton and S.D., told Brown what S.M. had told them about her relationship with Quinn. S.D. also told Brown that Quinn had invited her to meet him at his hotel room. Brown reported these incidents to Nate Drebes, a project manager for associate relations, but she perceived that Drebes "pushed [her reports] under the rug."

On March 28, 2017, Brown used Wal-Mart's ethics hotline to report that Quinn was soliciting sexual favors from Wal-Mart employees in exchange for money or employment-related favors. She provided details about the incidents described above and additionally alleged that Quinn had removed an "attendance occurrence" for S.M., allegedly in exchange for sexual favors. Brown stated that she believed Quinn's behavior was ongoing.

On April 4, 2017, Brown used the Wal-Mart ethics hotline to follow up on her initial report and report a new allegation of sexual harassment by Quinn. She alleged that S.D. told her that S.M. had asked Quinn how she could keep her job "since she had nine points and was facing an automatic termination." Quinn allegedly replied, "If you suck my dick." S.M.'s points were later removed.

No. 19-60719

Wal-Mart investigated. On May 17, 2017, Quinn made a statement denying any wrongdoing, expressing frustration with Brown, and indicating he was aware Brown was behind the allegations. A customer service representative, Nicole Rankin, testified via affidavit that it was well known in the store that Brown had reported Quinn for sexual harassment.

On May 19, 2017, Brown was fired. Three days later, Wal-Mart closed its sexual harassment investigation, finding the allegations against Quinn "unsubstantiated."

Quinn was later terminated for gross sexual misconduct based on the report of another Wal-Mart employee.

Wal-Mart's proffered legitimate, nondiscriminatory reason for Brown's termination is based on two company policies: AP-09 and the Coaching for Improvement Policy. AP-09 states that authorized associates, like Brown, may approach a shoplifting suspect only if four conditions are met: (1) an authorized associate has observed all five elements of an unlawful taking, (2) an associate witness is present, (3) the associate witness is able to be in a safe position while maintaining the ability to see and hear the interaction between the authorized associate and the suspect, and (4) doing so will not place an associate or customer in an unsafe situation. policy prohibits all associates from going beyond the facility's sidewalk to make an approach or obtain additional information regarding a suspect. The policy also prohibits patting down, frisking, or searching a suspect or a suspect's belongings such as a purse or bag. Any employee who witnesses a violation of the policy must report it to the market asset protection manager and regional asset protection director for the facility. Failure to do so may result in disciplinary action, including termination.

The Coaching for Improvement Policy, Wal-Mart's employee disciplinary policy, states that employees will receive one of three levels of

coaching if their performance fails to meet reasonable expectations, violates a company policy, or interferes with the safe, orderly, and efficient operation of business. First level coachings are essentially warnings; second level coachings require employees to submit plans of action outlining how they will improve their conduct or performance; and third level coachings require employees to submit action plans and discuss them with their managers, who will "take appropriate action" based on the plans. Employees may receive only one of each level of coaching in any 12-month period or they "will be subject to termination."

In June of 2016, Brown received a third level coaching under Wal-Mart's disciplinary policy. Her first written coaching was for absences and tardiness, and her second and third written coachings were for using derogatory language when referencing hourly associates. Therefore, any additional coaching before June of 2017 subjected Brown to termination.

On May 9, 2017, five weeks after Brown's second report of sexual harassment via the ethics hotline and ten days before her termination, Brown was called to the front of the store to handle a possible shoplifting incident. Before Brown got to the front of the store, customer service representative Rankin told Brown that a customer left the store with a grocery cart full of items, but the receipt obtained from the self-checkout register reflected that the customer had only paid for six items. Rankin also told Brown that she had instructed a cashier, G.C., to bring the customer back into the store. Brown told Rankin that it was not appropriate to follow the customer into the parking lot, but it was too late to correct the mistake.

According to Rankin and Jessica Danyus, another Wal-Mart employee who witnessed the incident, by the time Brown arrived at the front of the store, there was already a "huge commotion" and the customer was already back inside the store. Brown testified at her deposition, "when you come

back in the store and I have a receipt in my hand that have six items and you got a buggy-load and it have more than six bags in there, I'm going to ask you some questions." Brown compared the receipt to the items in the customer's bags and determined that the customer had paid for the items in her cart.

Angered by the inquiry, the customer demanded to speak to another manager. Quinn was standing just behind Brown, and when he approached, the customer gave him her receipt and showed him the contents of her bags, including the inside of her purse. Quinn checked her receipt, apologized to her, and escorted her outside, where he spoke with her for a while. According to Quinn, the customer insisted on reporting the incident.

Immediately thereafter, Quinn reported the incident to market manager Todd Jabbia. According to Quinn, after he described the incident to Jabbia, Jabbia immediately concluded "[t]hat's a bad stop." Jabbia then reported the incident to market asset protection manager Terry Hebert, who called Quinn to hear his version of events and also concluded there had been a bad stop. When asked at his deposition what Brown did wrong, Quinn maintained, contrary to Brown and Rankin's testimony, that Brown had instructed Rankin to stop the customer.

Hebert investigated. As was his normal practice, he instructed the store manager, Quinn, to obtain witness statements. Rankin testified that when Quinn obtained her statement, he asked her to say that Brown directed her to stop the customer. Rankin refused, and Quinn indicated she would lose her job. Rankin asked Quinn if she could keep her job if she wrote down that Brown told her to stop the customer, and he said, "that's what we been trying to get you to say." Ultimately, Rankin did not say that Brown told her to stop the customer.

After reviewing the witness statements gathered by Quinn and surveillance footage, Hebert concluded that Brown had "questioned a

customer without observing the Five Elements and despite the fact the customer had gone past the facility's sidewalk." "Ms. Brown should not have engaged the customer at all under the circumstances; she should have allowed the customer to leave." As a result, Hebert recommended that Brown receive coaching for violating AP-09. He concluded "[t]his next level coaching will result in termination due to previous coachings." Hebert also recommended that cashier G.C. receive a coaching and that Rankin be terminated despite having no coachings pending. Hebert testified via declaration that "Quinn did not participate or otherwise influence the decision to issue discipline for the AP-09 violation."

## II

We review "a district court's grant of summary judgment de novo, applying the same legal standards as the district court." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 823 (5th Cir. 2019) (citation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All evidence is viewed in the light most favorable to the nonmoving party. *Welsh*, 941 F.3d at 823.

## III

Brown alleges that she was fired in retaliation for reporting sexual harassment by Quinn. The antiretaliation provision of Title VII "prohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (alteration in original) (quoting 42 U.S.C. § 2000e-3(a)). Where, as here, a retaliation case is based on circumstantial evidence, we apply the *McDonnell Douglas* framework. *See Byers v. Dallas Morning News, Inc.*, 209

F.3d 419, 425, 427 (5th Cir. 2000); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, the plaintiff has the burden to prove a prima facie case of retaliation by showing (1) she engaged in a protected activity; (2) she "suffered an adverse employment action"; and (3) "a causal connection exists between the protected activity and the adverse employment action." *Byers*, 209 F.3d at 427.

"Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). However, the but-for standard does not apply at the prima facie case stage. *Garcia v. Prof'l Cont. Servs., Inc.*, 938 F.3d 236, 242 (5th Cir. 2019). Instead, "[a]t the prima facie case [stage], a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action." *Id.* at 243.

If the plaintiff establishes a prima facie case, then the employer has the burden of production to provide "a legitimate, non-discriminatory reason" for the adverse employment action. *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). If the employer meets this burden, then the plaintiff has the burden to prove that the proffered reason is pretextual. *Id.* "A plaintiff may establish pretext by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence." *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013).

Ultimately, in order to survive a motion for summary judgment, a plaintiff must show "a 'conflict in substantial evidence'" on the question of whether the employer would not have taken the adverse employment action but for the protected activity. *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019) (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658

(5th Cir. 2012)). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* at 561–62 (internal quotation marks and citation omitted).

Under the cat's paw theory of liability, a plaintiff can establish but-for causation even if the decisionmaker directly responsible for the adverse employment action did not act out of retaliatory animus. *See Zamora v. City of Houston*, 798 F.3d 326, 335 (5th Cir. 2015). A plaintiff proceeding under this theory must prove that (1) her supervisor, motivated by retaliatory animus, took action intended to cause an adverse employment action; and (2) that action was the but-for cause of her adverse employment action. *Id.* at 333.

"[T]here will be cases where a plaintiff has both established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, yet 'no rational factfinder could conclude that the action was discriminatory.'" *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). And, in an appropriate case, "a factfinder may infer the ultimate fact of retaliation from the falsity of the [employer's] explanation." *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002). In deciding whether summary judgment is warranted, the court should consider "numerous factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Price*, 283 F.3d at 720 (internal quotation marks and citation omitted).

The parties dispute (1) whether Brown has met her burden to prove the causation prong of her prima facie case and (2) even if she has, whether Brown has put forth adequate evidence of pretext—specifically, whether a reasonable jury could conclude that Quinn's actions were the but-for cause

of Brown's termination. Wal-Mart concedes that Brown engaged in protected activity and experienced an adverse employment action. Brown concedes that Wal-Mart has proffered a legitimate, nondiscriminatory reason for her termination. And Wal-Mart also concedes, for the purpose of summary judgment, that there is a genuine dispute of material fact as to the first prong of the cat's paw theory—whether Quinn, motivated by retaliatory animus, took action intended to cause an adverse employment action. We address each dispute in turn.

IV

As stated above, "[a]t the prima facie case [stage], a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action." *Garcia*, 938 F.3d at 243. However, "[t]he protected act and the adverse employment action must be very close in time to establish causation by timing alone." *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 948 (5th Cir. 2015) (quotation marks, citation, and alterations omitted). We have held that a period of two-and-a-half months, *Garcia*, 938 F.3d at 243, a period of two months, *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 995 (5th Cir. 2005), and a period of six-and-a-half weeks, *Porter*, 810 F.3d at 949, are close enough to show a causal connection.

Brown made her first report to the Wal-Mart ethics hotline on March 28, 2017, seven weeks and three days before her termination, and she followed up on that report on April 4, 2017, six weeks and three days before her termination. Because the approximately six-to-seven-week gap between Brown's protected activity and her termination is shorter than gaps that we have previously found sufficient to show a causal connection, Brown has met her prima facie burden based on timing alone.

No. 19-60719

V

Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action. *See, e.g.*, *Garcia*, 938 F.3d at 244; *Wheat v. Fla. Par. Juv. Just. Comm'n*, 811 F.3d 702, 710–11 (5th Cir. 2016). Brown relies on the following evidence to demonstrate but-for causation: (1) the temporal proximity between her protected activity and her termination, (2) evidence that Quinn talked to Jabbia and Hebert before the investigation began and they concluded there had been a bad stop, (3) evidence that Quinn attempted to influence Rankin's witness statement, and (4) evidence that Quinn engaged in similar misconduct during the same shoplifting incident and did not receive any discipline from Wal-Mart.[1]

The temporal proximity between Brown's protected activity and her termination is relevant to, but not alone sufficient to demonstrate, pretext. *See Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007). Therefore, we must consider whether Brown's other evidence, in combination with this temporal proximity, is sufficient for a reasonable jury to find but-for causation.

---

[1] Brown also argues that Wal-Mart's proffered reason for her termination is pretextual because Wal-Mart is misinterpreting its own policies. She argues that her undisputed actions on May 9, 2017, did not violate the plain meaning and purpose of AP-09 and that Wal-Mart was not required to terminate her for receiving another coaching under the Coaching for Improvement Policy. But the relevant issue is not whether Brown's actions actually constituted a violation of AP-09 or whether Wal-Mart was required to terminate Brown for a perceived violation; it is whether Hebert based his recommendation to terminate Brown on his independent conclusion that Brown violated AP-09 or on Quinn's retaliatory actions. *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408–09 (5th Cir. 1999) ("The issue is whether [the employer's] perception . . ., accurate or not, was the real reason for [the plaintiff's] termination.").

First, Brown argues that Quinn interfered with Hebert's investigation by talking to Jabbia and Hebert immediately after the incident. During these conversations, Quinn told Jabbia and Hebert his version of what had happened, which likely included his assertion that Brown instructed Rankin to stop the customer. According to Quinn, both Jabbia and Hebert concluded that there had been a "bad stop" at that moment, before any investigation had been conducted. From this evidence, Brown argues that a jury could conclude "Quinn, motivated by retaliatory animus, poisoned the well from the outset and set in course a series of events that . . . he knew would result in Ms. Brown's termination."

This evidence could lead a reasonable jury to conclude that Quinn influenced Hebert's initial perception of the incident, but, without more, it is not sufficiently probative of the ultimate issue—whether that initial perception was the but-for cause of Brown's termination. Brown does not contest that after these initial conversations took place, Hebert ordered an investigation into what happened and who should be disciplined. After reviewing witness statements and surveillance footage, Hebert recommended that Brown be terminated. Notably, that recommendation was based on his conclusion that Brown should not have engaged with the customer once she knew that there had been a bad stop, not that she had instructed Rankin to conduct the bad stop.

Brown is really arguing that a reasonable jury could conclude that Hebert lied about his reason for recommending termination. According to Brown, although Hebert said his recommendation was based on the fact that Brown engaged with the customer, it was really based on Quinn's accusation that Brown instructed Rankin to stop the customer. Because Brown has not provided any evidence to undermine Hebert's credibility, we disagree. There is no evidence from which a reasonable jury could conclude that Hebert based his recommendation to terminate Brown on his initial perception of the

incident, which may have been influenced by Quinn and Quinn's retaliatory motive. *Cf. Gee*, 289 F.3d at 346–37 (finding summary judgment inappropriate where, *inter alia*, there was evidence that the plaintiff's supervisor and another employee who knew of the harassment spoke negatively about the plaintiff at a meeting with the ultimate decisionmaker and another individual who was present at that meeting testified that the decision not to promote the plaintiff seemed to be made at that meeting).

Next, Brown argues that Quinn interfered with Hebert's investigation by attempting to influence witness statements. Specifically, Rankin testified via affidavit that Quinn threatened her with termination if she did not say that Brown instructed her to stop the customer. While this evidence is deeply disturbing, it is not sufficient to prove but-for causation as to Hebert's termination recommendation because the record conclusively demonstrates that Quinn's attempts were unsuccessful.[2] Not only did Rankin refuse to lie, but no one else was successfully pressured into blaming Brown either. None of the witness statements in the record accuses Brown of instructing Rankin to stop the customer. Consequently, Hebert's recommendation to terminate Brown, after having viewed a video of Brown's interaction with the customer, was based on his conclusion that Brown should not have engaged the customer once she knew that there had been a bad stop, not Quinn's accusation that Brown instructed Rankin to stop the customer. Brown admits that she told Rankin the stop was bad before engaging with the customer.

---

[2] Were this not the case, the fact that Quinn, who Brown had recently reported for sexual harassment, was given a role in investigating Brown's potential misconduct would likely be sufficient to survive a motion for summary judgment. Typically, an investigation cannot be said to be "independent" enough to break the causal chain when a supervisor with retaliatory motive participates in that investigation. *See Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 759–60 (5th Cir. 2017).

Finally, Brown argues that Wal-Mart's proffered reason for her termination is pretextual because Quinn is a similarly situated employee who received no discipline following the shoplifting incident. In fact, she argues that Quinn engaged the customer in a manner that was "far more intrusive and lengthier" than her own minimal interaction with the customer. In addition to looking at the customer's receipt and the items in her cart, Quinn looked in the customer's purse—an action that is explicitly prohibited by AP-09—and he talked with the customer for an extended period of time in the parking lot.

Typically, "[a] plaintiff who proffers the treatment of a fellow employee must show that the plaintiff's termination was taken 'under nearly identical circumstances' as those faced by the comparator." *Garcia*, 938 F.3d at 244 (quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009)). "Employees are similarly situated when they h[o]ld the same job responsibilities, share[] the same supervisor or ha[ve] their employment status determined by the same person, and have essentially comparable violation histories." *Id.* (internal quotation marks and citation omitted). However, we have previously considered disparate treatment of less similarly situated comparators as some evidence of pretext, even though it is less probative than evidence of a more similarly situated comparator. *See Porter*, 810 F.3d at 950 (considering evidence of differential treatment received by four employees but noting that the plaintiff had "not demonstrated that those four employees were similarly situated"); *Shackelford*, 190 F.3d at 409 (considering evidence of a "similarly situated" employee without comparing the employees' positions, supervisors, or violation histories).

Viewing the evidence in the light most favorable to Brown, there are important ways in which Brown and Quinn were similarly situated on May 9, 2017. Both responded to a disgruntled customer who had been

inappropriately stopped by another Wal-Mart employee, and both compared that customer's receipt to the items in her cart.

However, there are also important ways in which Brown and Quinn were not similarly situated. Most notably, Brown admits that she was aware the stop violated AP-09 before she addressed the customer. Rankin told Brown that she had sent a cashier into the parking lot to bring the customer back into the store, and Brown told Rankin that was not appropriate. The record does not indicate that Quinn was aware of the same background facts when he engaged with the customer, and Quinn only engaged with the customer after she asked to speak with another manager. Therefore, Wal-Mart could have concluded it was a violation of AP-09 for Brown to engage with the customer but it was not a violation of AP-09 for Quinn to engage with the customer.

Having considered all of Brown's evidence of pretext, we must decide whether a reasonable jury could find that Quinn's actions were the but-for cause of Hebert's recommendation to terminate Brown. As we've explained, to survive Wal-Mart's motion for summary judgment, Brown's evidence of pretext must show "a conflict in substantial evidence" on the question of whether Wal-Mart would not have terminated her but for her reporting of Quinn's sexual harassment. *See Musser*, 944 F.3d at 561 (internal quotation marks and citation omitted).

In *Musser*, we explored how much evidence of causation is required to survive a motion for summary judgment. *Id.* at 562. Temporal proximity combined with positive performance reviews prior to the protected activity is insufficient. *Id.* (citing *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 334 (5th Cir. 2017)). On the other hand, temporal proximity combined with a dispute of facts leading up to termination, disparate treatment of a similarly situated employee, harassment from a supervisor

following the protected activity, the stated reason for the termination being known to the employer for years, and the employer standing to lose millions of dollars if its conduct was discovered, is enough. *Id.* (citing *Garcia*, 938 F.3d at 244). Similarly, "temporal proximity, unfounded performance concerns, warnings from other employees not to engage in the protected activity, and disparate treatment" is enough. *Id.* (citing *Shackelford*, 190 F.3d at 409). We have also reversed summary judgment where the plaintiff provided evidence of interference with an allegedly independent investigation, disingenuous and inconsistent explanations by her employer, and prior glowing reviews. *Gee*, 289 F.3d at 347–48.

Brown's evidence of pretext is weaker than that provided by the plaintiffs in *Garcia*, *Shackelford*, and *Gee*. Brown does not dispute the facts that Hebert claims to have relied upon in finding a violation of AP-09, above all her own admission that she knew a bad stop occurred before she engaged with the customer, nor does she provide any evidence casting doubt on Hebert's credibility. There are meaningful differences between Brown's and Quinn's responses to the potential shoplifting incident that could explain their differential treatment. Finally, Brown does not provide other evidence, such as warnings from other employees or shifting explanations from Wal-Mart, to cast further doubt on Wal-Mart's proffered legitimate, nondiscriminatory reason. We conclude that a reasonable jury could not find that Quinn's actions were the but-for cause of Wal-Mart's termination of Brown based on the record before us. Therefore, summary judgment was appropriate.

AFFIRMED.