# United States Court of Appeals
# for the Fifth Circuit

———————

United States Court of Appeals
Fifth Circuit

**FILED**
January 9, 2026

Lyle W. Cayce
Clerk

No. 25-30222

———————

JUSTIN PHILLIPS,

*Plaintiff—Appellant*,

*versus*

ENTERPRISE PRODUCTS COMPANY,

*Defendant—Appellee*.

———————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:24-CV-314

———————

Before BARKSDALE, WILLETT, and DUNCAN, *Circuit Judges*.

PER CURIAM:[*]

Phillips alleges that his supervisor embarked on a retaliatory "fishing expedition," dredging up negative information about him in retaliation for Phillips's accusation that this supervisor favored white employees and recommended his termination accordingly. Enterprise's account is simpler: It terminated Phillips because of poor work performance.

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 25-30222

But at summary judgment, we must make every justifiable inference in favor of Phillips's version of events. Though Phillips's job performance may well have played a role, a reasonable juror could find that Enterprise fired him because he complained of racial discrimination. We stress that we do not decide whose version is correct. Indeed, the evidence at trial may well show that Enterprise terminated him solely because of his poor performance. Although it is a close call, we conclude a genuine dispute of material fact exists.

Accordingly, we REVERSE and REMAND for further proceedings.

## I

## A

In May 2022, Justin Phillips, an African American man, joined Enterprise as a truck driver at its Breaux Bridge, Louisiana terminal. He had previously worked for Enterprise in 2014. Phillips reported to Billy Hallum and Korey Dugas. Dugas reported to Transportation Director Delbert "Shane" Mauldin, who in turn reported to Chad Woods, Senior Director of Transportation.

## B

Enterprise uses a points-based disciplinary policy for its drivers that assesses a set number of points for various infractions. The assigned amounts increase each time an employee repeats the same violation. Points expire after twelve months, and expired points cannot be used against an employee. The policy provides that its list of designated points and infractions "is not exhaustive" and that Enterprise reviews each incident "with HR to determine the proper action." If an employee accrues 100 or more points within a rolling twelve-month period, Enterprise may terminate that employee. One

Enterprise executive, Woods, testified that any disciplinary action putting a driver over the 100-point threshold receives "heightened scrutiny."

## C

From June 2022 to January 2023, Dugas and Hallum issued Phillips seven separate disciplinary write-ups for various infractions—totaling 90 disciplinary points.

In June 2022, Phillips received 20 disciplinary points for using a trailer that Enterprise had removed from service for maintenance. That August, Dugas wrote Phillips up and gave him a verbal warning for failing to conduct a "360 Walk Around" of his truck. Similarly, in September, Dugas issued a warning to Phillips for starting his shift and leaving the terminal before his approved time. In this September warning letter, Dugas wrote that Phillips "ha[d] shown a pattern of starting at other hours instead of his assigned time with out [sic] approval."

Then, in October 2022, Enterprise supervisors wrote up Phillips three more times. First, after receiving an email from Guy Landry—a plant manager at Promix, an Enterprise joint-venture—that Phillips failed to wear personal protective equipment (PPE) and gave "attitude" to a Promix employee, Enterprise issued him 20 disciplinary points. A few weeks later, Phillips ran a red light and earned another 20 points. Finally, on October 27, Hallum issued Phillips a warning letter for starting his route earlier than his scheduled time. Hallum noted that Phillips "continuously leaves early when ever [sic] he wants" and that, although it was only "the second written" notice about this infraction, Phillips had "been talked to about it many times." Hallum then issued an additional 10 disciplinary points.

On December 25, 2022, Dugas issued Phillips's third written warning for beginning his shift earlier than his prescribed time and assessed 20 disciplinary points for this infraction, bringing Phillips's total to 90 points.

No. 25-30222

On January 1 and 8, 2023, Phillips similarly failed to report to work at his prescribed time. But instead of assessing disciplinary points for these two infractions, on January 12, Dugas reached out to human resources and recommended that Phillips start a performance improvement plan. The plan included a "detailed outline" of Phillips's various infractions and point assessments. Notably, it did not include the June 2022 incident or the accompanying 20 points. So the plan reflected a 70-point total. Phillips signed the plan on January 18.[1]

Sometime between January 23 and February 2,[2] Phillips confronted Dugas for disciplining both him and another African American driver "for clocking in early while . . . ignoring Caucasian drivers' infraction of that same policy." Specifically, Phillips complained that Randy Miller, a white driver, often started his shifts before his prescribed time and faced no discipline. Dugas stated in his deposition that during that conversation, Phillips accused him of showing "favoritism" toward white drivers. Dugas further stated that Phillips's accusation was a "bold claim" that "absolutely" offended him. But this was far from the first time Phillips had complained to Dugas about his alleged favoritism. Phillips testified that he approached Dugas "well over six times" about this topic previously. Once Phillips showed Dugas evidence of Miller's infraction, Dugas issued discipline to Miller on January 26.

---

[1] The parties dispute whether the plan had an expiration date. Phillips argues it expired on February 15 because, when Dugas sent the signed plan to HR, he stated that Phillips's progress would be assessed "30 days f[ro]m now (15 Feb) to see if there is any improvement." Enterprise, on the other hand, contends the plan had no stated deadline. In fact, the plan expressly provided that it would "remain in effect until" there had been "sustained improvement" in Phillips's performance.

[2] The parties likewise dispute when this conversation occurred. Phillips claims it was "on or about February 2." Dugas, however, testified the conversation occurred "closer to the date" he wrote up Randy Miller, the other driver, for this infraction—which was January 26.

No. 25-30222

On February 25, Phillips encountered a mix-up involving his trailer. The parties dispute what happened that night, so we recount each side's account.

Phillips states that after returning from a break, he discovered that his truck had been moved and the trailer disconnected and taken. After contacting his supervisors and learning that Enterprise had reassigned the trailer to another driver, Phillips told them this violated typical practice because Phillips had signed his name next to that trailer "on the board"—effectively assigning it to him for the week. After checking the board and finding no other trailers available, he realized he lacked the equipment necessary to complete his load and went home.

Enterprise offers a different account. It explains that it had a limited supply of trailers designated for routes to Arkansas. When Phillips claimed one of those Arkansas trailers—even though he was not scheduled to drive to Arkansas that night—Enterprise approved another driver's request to disconnect the trailer from Phillips's truck and use it instead. Dugas testified that after approving that request, he reassigned Phillips a load to Pascagoula, Mississippi, and that "there was an LP trailer there to be able to do that load," but Phillips "didn't want to do that." As Enterprise tells it, "Phillips refused to drive his assigned load" because he was upset that his trailer had been taken.

On February 27, Dugas emailed his supervisor, Mauldin, recommending Phillips's termination. Dugas's email stated that Phillips's performance was "no longer acceptable" and attached a timeline of his infractions. Like the plan, that timeline omitted the June 2022 incident in which Phillips

received 20 points for using a trailer under maintenance.[3] Based on the timeline, the termination recommendation showed that Phillips had 70 disciplinary points rather than 90, and it added two new infractions that post-dated his plan—a February 21 incident involving improper PPE and the February 25 refused-load incident—neither of which carried point assessments.

Mauldin forwarded Dugas's termination recommendation to Enterprise's HR representative, stating: "I'm not sure if we have enough for HR to support." Fifteen minutes after Mauldin's email to HR, Dugas emailed Landry (the Promix plant manager), asking him to call Dugas. The next morning, Landry forwarded Dugas a 2014 email with the following note:

> I found this old email that I thought I would share with you. The issues with Justin [are] nothing new. The operators at Promix say he is always in a hurry, doesn't have his PPE and tries to cut in front of other drivers. Not sure what needs to be done but when we have as many trucks as we have right now there is no time for us to baby sit this guy. Just Sunday night he was on his cell phone by the trucks which is not allowed.

Dugas promptly forwarded Landry's email chain to Mauldin and then replied to Landry, "Perfect! Exactly what I needed. Appreciate it." Mauldin forwarded the email chain to Woods (the Senior Director of Transportation), noting, "if you notice the bottom email is where [Phillips] was here the first time. Seems we are having the same issues." Woods instructed Mauldin to prepare an "Adverse Action" on Phillips, including the "latest incident from Promix," which would "push [Phillips] over 100 points." Mauldin prepared the termination recommendation, adding the cell phone incident and describing Phillips as "refus[ing] to follow the Plant and terminal rules." Mauldin

---

[3] Phillips argues that "[t]here is no material dispute that, as of February 21, 2023," he had only accumulated 70 disciplinary points based on the plan's recounting. Enterprise, however, maintains that Phillips's point total at that time was 90.

recommended issuing Phillips 40 points for the cell phone incident, "w[hi]ch will total 110 points and his employment be terminated immediately."[4] After senior management approved, Enterprise fired Phillips on March 3.

### D

Phillips sued Enterprise, alleging retaliation under Title VII and 42 U.S.C. § 1981. The district court granted summary judgment for Enterprise, finding "there are no facts supporting a retaliatory motive." Applying the *McDonell Douglas* framework,[5] the court concluded that Phillips failed to show Enterprise's stated reason for termination was pretextual.

### II

We review summary judgment rulings *de novo. Batiste v. Lewis*, 976 F.3d 493, 500 (5th Cir. 2020). Courts may grant summary judgment only when "no genuine dispute as to any material fact" exists "and the movant is entitled to judgment as a matter of law." *Id.* (internal quotations omitted); FED. R. CIV. P. 56(a). A fact dispute is "genuine" if "a reasonable jury could return a verdict for [the nonmovant] based on the evidence." *Coleman v. BP Expl. & Prod., Inc.*, 19 F.4th 720, 726 (5th Cir. 2021). Importantly, as stated earlier, "we must view all evidence and draw all justifiable inferences in favor of [Phillips], the nonmovant." *Id.*

### III

"The *McDonnell Douglas* burden-shifting framework applies to Title VII retaliation claims." *Shahrashoob v. Tex. A&M Univ.*, 125 F.4th 641, 652

---

[4] This 110-point calculation derives from Dugas's provided timeline, which included only 70 points' worth of infractions.

[5] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

(5th Cir. 2025).[6] Because the parties do not dispute that Phillips established a prima facie case of retaliation, the burden shifts to Enterprise to articulate a "legitimate, non-retaliatory reason" for firing Phillips. *Id.* at 653. Enterprise has done so: poor work performance. "Job performance is a legitimate, non-retaliatory reason for termination." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007). The burden now shifts back to Phillips to show that Enterprise's proffered reason is pretextual. *See id.* This showing requires evidence "that the adverse action would not have occurred 'but for' the employer's retaliatory motive." *Feist v. La., Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). An employee can show pretext "by showing that a [retaliatory] motive more likely motivated her employer's decision." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020). "Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action." *Id.* at 578. For Phillips to survive summary judgment, he must show a "conflict in substantial evidence." *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1002 (5th Cir. 2022).

IV

As evidence that Enterprise actually fired him in retaliation for his allegation of racial discrimination, Phillips points to: (1) Dugas's testimony that Phillips's allegation of racial discrimination was a "bold claim" that "absolutely" offended him; (2) the temporal proximity between the racial discrimination complaint and Dugas's actions initiating the termination; (3) Phillips's dispute of facts leading up to his termination; and (4) the "timing and substance" of Dugas's emails to Enterprise management seeking

---

[6] And, as for the § 1981 retaliation claim, we apply "the same rubric of analysis as Title VII." *Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1209 (5th Cir. 2021) (internal quotations omitted).

information to support a termination request.[7] Again, our job is to view this evidence in the light most favorable to Phillips. We address each piece of evidence in turn.

For starters, the fact that Dugas was "absolutely" offended by Phillips's accusation of racial discrimination does not by itself establish pretext. *See Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 547 F. App'x 484, 488–90 (5th Cir. 2013) (per curiam) (finding employer's testimony of being "mad" that employee had engaged in protected activity "standing alone" did not show pretext). Dugas characterized the allegations as a "huge deal" and a "bold claim." But even if he was offended, Dugas investigated Phillips's complaint about Miller and disciplined Miller. Is Dugas's testimony evidence of retaliatory animus? Not "standing alone." *Id.* at 490.

Nor does temporal proximity "on its own" get Phillips all the way there. *See Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 243–44 (5th Cir. 2019). But "[t]he combination of suspicious timing with other significant evidence of pretext can be sufficient to survive summary judgment." *Id.* at 244 (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999)). Whether the conversation between Dugas and Phillips occurred on January 23 or February 2, Dugas initiated the termination process on February 27, only 25–35 days later. And Enterprise fired Phillips just four days later, on March 3. We find this timing suspicious, but, again, Phillips needs more.

---

[7] Phillips also contends that Enterprise's "shifting rationales" for his termination indicate pretext. He notes that Dugas and Mauldin relied on different infractions in their termination recommendations—Dugas added the February 21 PPE incident at Promix and the February 25 "refusal of load," while Mauldin added the cell phone violation. We agree with the district court that no reasonable juror could "infer pretext" from Mauldin's inclusion of different infractions.

We next consider Phillips's disputed facts about the post-plan incidents. Just because Phillips tells a different story, that does not end our analysis. *See LeMaire*, 480 F.3d at 391 ("Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext."). Phillips disputes multiple facts: (1) his alleged failure to wear PPE at Promix on February 21; (2) using his cell phone at Promix; and (3) refusing the load on February 25. The district court, however, rejected Phillips's characterization of the facts. As to the PPE incident, the court pointed to Hallum's testimony that Phillips admitted he did not wear his PPE. But Hallum made this statement in reference to the October 2022 PPE incident, *not* the February occasion. As to the cell phone incident, Landry testified that he did not "physically see [Phillips] on his cell phone" but rather that the observation was "passed on to [him] by someone else." Phillips "adamantly denies" using his phone at the Promix facility. He stated: "[t]hey got cameras out there . . . [and] watch your every move" and doing so would be grounds for termination. Finally, the district court credited Dugas's account of the load-refusal story—that Phillips tried to take a trailer not assigned to him and left when that trailer was disconnected, though another trailer was available—over Phillips's account, which is that it was his assigned trailer and that it was taken from him and that there were no other trailers available.

Phillips faults the district court for deviating from its summary-judgment role by making credibility determinations and resolving inferences *against* him. We agree. Competing testimony and credibility determinations are hallmarks of a trial. "Evidentiary conflicts must be resolved at trial, not by summary judgment." *Shelly C. ex rel. Shelbie C. v. Venus Indep. Sch. Dist.*, 878 F.2d 862, 863 (5th Cir. 1989). We find a "conflict in substantial evidence," *Saketkoo*, 31 F.4th at 1002, as to whether some of the disciplinary infractions occurred.

No. 25-30222

We turn next to the "fishing expedition" Phillips accuses Dugas of undertaking. Phillips relies on the 70-point total reflected in the termination recommendation. He claims that Dugas's inclusion of two new incidents post-plan—the February 21 PPE incident at Promix and the February 25 "refusal of load"—would still leave him below the 100-point threshold. Phillips contends he would have received only "at most" 20 disciplinary points for the PPE incident because it was a second related offense. And he contends the "refusal of load" incident would not have resulted in the assessment of *any* points because, per Enterprise's "Refusal of Dispatch" policy, the recourse for unreasonable refusal is that the driver is "sent home without pay or minimum hour guarantee." Even viewed in Phillips's favor, as we must, this does little to show pretext, especially because Enterprise's policy states that designated points and infractions are "not exhaustive." Phillips offers this point-allocation theory to show that a reasonable factfinder could infer Dugas had a retaliatory motive by trying to fire him when his point total fell below the 100-point threshold—even if those additional infractions would have resulted in points. This contention does little to persuade us of pretext; however, we find Dugas's emails to Mauldin and Landry on February 27 and 28 more problematic.

On February 27, Dugas reached out to the Promix plant manager, Landry, asking him to call him. We cannot, however, credit Phillips's argument that Dugas was "likely armed with the warning from Mauldin that his . . . termination request lacked necessary support"—because Dugas does not appear to have been included on Mauldin's email to HR. The summary-judgment record provides that: Dugas emailed the termination request to Mauldin; Mauldin forwarded it to HR, stating he was "not sure if we have enough for HR to support"; and then fifteen minutes later Dugas contacted Landry to request a call. Landry then sent Dugas an email the next morning, recounting the new cell phone violation and including an email from 2014

11

with a past complaint about Phillips—and Dugas replied, "Perfect! Exactly what I needed!"[8] It was this email from Landry that Dugas sent to Mauldin, who sent it up the chain, which ultimately led to Phillips's termination—because the cell phone incident would "push him over 100 points." Landry and Dugas both testified that Dugas did not tell Landry he was considering Phillips's termination, though Landry also testified that after his call with Dugas he "went and searched through [his] stuff to see if there was anything else that would come up."

The district court considered (most of) these facts and found Dugas's fishing expedition indicative not of pretext but rather of Dugas's attempts to gather information to fire Phillips because of poor performance. As the district court put it, "[the evidence] suggests that Dugas believed it was unfavorable for [Enterprise] to continue to employ [Phillips] because of his consistent disciplinary issues and therefore sought information to help support his termination recommendation." It seems the district court reasoned that Dugas's quest to find dirt on Phillips was not problematic because it was not pretextual—Dugas was just frustrated with numerous disciplinary issues and wanted more data to show the poor performance. But while this may end up being true, viewed in the light most favorable to Phillips, a reasonable factfinder could conclude that Dugas was instead acting out of retaliatory motive because Phillips accused him of racial discrimination.[9] After all, with just 70

---

[8] We note that Dugas, Mauldin, Casey Teague (the Vice President of Trucking), and Woods all testified that the 2014 incident had no bearing on Phillips's termination.

[9] Because we see no evidence that Enterprise's ultimate decisionmakers acted with retaliatory motive, Phillips's argument rests on a cat's paw theory of liability, under which "a plaintiff can establish but-for causation even if the decisionmaker directly responsible for the adverse employment action did not act out of retaliatory animus." *Brown*, 969 F.3d at 577. To succeed, Phillips must show "that (1) [his] supervisor, motivated by retaliatory animus, took action intended to cause an adverse employment action; and (2) that action was the but-for cause" of his termination. *Id.* A jury could conclude that Dugas's actions—

listed points, Dugas recommended Phillips's termination, promptly contacted Landry, and after receiving an additional infraction that was "exactly what he needed," forwarded that along to Mauldin. A reasonable juror could infer that Dugas was determined to terminate Phillips—who, just weeks prior, had accused him of racial discrimination.

Viewing all of this evidence in the light most favorable to Phillips—Dugas's statements of being "absolutely" offended, the temporal proximity, Phillips's disputes of fact leading up to his termination, and Dugas's email exchange with Landry seeking more information on Phillips—we conclude that a reasonable juror could find the facts "supported an inference of pretext." *Garcia*, 938 F.3d at 245. We previously found sufficient evidence of pretext when employees presented evidence of temporal proximity and disputed facts leading to the termination. *See id.* at 243–246; *Shackelford*, 190 F.3d at 409–410. We recognize that the employees in *Garcia* and *Shackelford* had histories of positive performance reviews. *See Garcia*, 938 F.3d at 239; *Shackelford*, 190 F.3d at 408. Here, by contrast, we have no evidence of Phillips ever receiving a positive performance review. If anything, Phillips was trending towards reaching the 100-point threshold on his own. That said, even if the claim of racial discrimination was the final straw for Dugas in deciding a termination recommendation, we hold that there is sufficient evidence for a reasonable juror to conclude the rush to get Phillips terminated was pretextual. After all, "any evidence that casts doubt" on Dugas's motivation can prove pretext. *Brown*, 969 F.3d at 578.

---

emailing Landry and Mauldin to solicit information and recommend termination—were the but-for cause of Phillips's firing and that sufficient evidence supports an inference those actions were retaliatory.

V

To be sure, our holding "does not mean that [Phillips] will prevail at trial." *Garcia*, 938 F.3d at 246. "It means only that [he] produced enough evidence to survive summary judgment." *Id.*

Here, genuine disputes of material fact persist; facts are contested and motives disputed. And where the evidence admits of competing inferences, the task is the jury's, not the judge's. It is jurors who weigh the evidence, assess credibility, and decide what—and whom—to believe. We therefore REVERSE and REMAND for further proceedings.