# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 14, 2023

Lyle W. Cayce
Clerk

————————

No. 22-10535

————————

Patrick Thomas,

*Plaintiff—Appellant*,

*versus*

Cook Children's Health Care System; Cook Children's
Physician Network; Cook Children's Medical Center;
Rick Merrill; Nancy Cychol; W. Britt Nelson; Larry
Reaves; Donald Beam,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:20-CV-1272

———————————————————————

Before Davis, Southwick, and Oldham, *Circuit Judges*.

Per Curiam:[*]

Plaintiff-Appellant, Patrick Thomas, M.D., appeals the Rule 12(b)(6) dismissal of his Title VII hostile-work-environment claim and the summary-judgment dismissal of his racial discrimination and retaliation claims. For the reasons set forth below, we AFFIRM.

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-10535

## I. BACKGROUND

Thomas, who is African American, was employed by Defendants-Appellees, Cook Children's Health Care System, Cook Children's Physician Network, and Cook Children's Medical Center ("Cook"), as a pediatric surgeon for approximately twelve years until early 2020. Under his employment agreement, Thomas had to maintain his hospital credentials in order to remain on staff. Cook's Joint Credentials Committee ("JCC") traditionally performs a review every two years to determine whether a physician's credentials should be renewed. The JCC considers such factors as the physician's experience and clinical competence and judgment in the treatment of patients; ethics and professional conduct; and compliance with staff bylaws.

At Cook, a staff member can submit a complaint regarding, inter alia, a fellow staff member's professional conduct by filing an "event report." During the time period relevant to this matter, when an event report was filed against a physician for "disruptive behavior," Cook's risk management was supposed to review the report first to determine if it presented a serious issue and/or required further investigation. If the report was deemed serious, it was forwarded to the JCC for consideration when that physician was up for renewal of credentials and reappointment. A serious report was also sent to the physician's medical director, the head of the area of the hospital where the event took place, and the chairman of the Peer Assistance Committee ("PAC").[1] The physician's supervisor (usually the medical director) then was supposed to counsel the physician about the behavior described in an event report.

_____

[1] As one physician (Dr. Napoleon Burt) explained, the purpose of the PAC is to help "physicians facing problems that can impact their ability to treat patients."

No. 22-10535

Cook admits, however, that it was common for event reports to be "delayed" and not presented for resolution until the physician was up for reappointment. This happened in Thomas's case. Between 2017 and 2019, nineteen event reports and two patient complaints were filed against Thomas, but he was not made aware of them until August 2019, shortly before the JCC considered renewal of his credentials. When the JCC learned of the amount of event reports and complaints that had been filed during the previous two-year credentialing cycle, and that most of them had not been addressed/resolved, the JCC recommended renewing Thomas's credentials for a shortened period (ninety days) and referred him to the PAC for consideration of those reports.[2]

On September 27, 2019, after Thomas learned he was being referred to the PAC and his credentials were being renewed for only ninety days, he sent Cook his first written complaint of racial discrimination. One of the PAC's members who is also African American, Dr. Napoleon Burt, strongly argued that Thomas's anger was understandable in that Thomas was unaware of the many event reports and patient complaints until much later and that this type of delay was a recurring issue the PAC was frequently forced to address. Burt urged that a smaller delegation meet with Thomas. Burt and two other doctors were part of the delegation—Dr. Maria Perez and Dr. Chip Huffman.

After two meetings with the delegation, however, Thomas wrote a letter on October 17, 2019, implying that Perez and Uffman "had suggested that there was a culture of racial discrimination at [Cook]." Thomas contended that during one of the meetings, Perez stated that as a Cuban

---

[2] Earlier in Thomas's career, the JCC, when learning of unresolved event reports regarding Thomas's behavior, similarly recommended renewing Thomas's credentials for a shortened period and referred Thomas to the PAC to review those reports.

woman, she understood it was hard to work at Cook, and that as "an African American male," Thomas "ha[d] to work twice as hard to be [at Cook]." Thomas further contended that Uffman visited his office to inform him that the Cook administration "was getting nervous about the emails" Thomas was sending, and that Uffman stated: "We want you here at Cook. But these emails aren't making it easy."

The PAC conducted a meeting on October 23, 2019, which Thomas attended. During the meeting, Thomas refused to accept any responsibility for the behavior alleged in the event reports. Rather, he wanted to go through each event report to identify non-issues and non-truths. He also expressed concern/frustration with the fact that many of the reports were not raised in a timely fashion with him. The PAC agreed that this was a problem, although not unique to Thomas, and recommended that Thomas meet weekly with the head of perioperative surgery (Valerie Gibbs) so that he could receive—and give—any concerns in a timely fashion. The PAC also recommended (as did the delegates) that Thomas receive coaching from Dr. Richard Mellina or participate in a coaching program.[3]

Thomas complained that the PAC's recommendation of coaching and meetings with Gibbs was retaliatory, and he demanded further clarification and information. At the same time, however, he secured a coach (Sola Winley) and never refused to meet with Gibbs. Dr. Larry Reaves, chair of the PAC, nonetheless wrote Thomas on January 9, 2021, enclosing a letter agreement setting forth the PAC's recommendations and requiring that Thomas sign it. Reaves testified that he asked Thomas to "sign an agreement to voluntarily accept the recommendations" because "after all of the

---

[3] Mellina provided counseling to Thomas earlier in his career when event reports repeatedly prompted the JCC to reappoint him for shortened reappointment periods.

communication breakdowns and repeated lack of commitment, [he] felt that it was appropriate to have written confirmation so that there would be no misunderstandings."

In the weeks that followed, Thomas drafted numerous letters to Joe Gallagher, Cook's General Counsel, repeatedly alleging that Cook was "retaliating against him for engaging in protected activity." After meeting with Thomas, the JCC outlined its terms for renewal of Thomas's credentials in a February 20, 2020 letter. Specifically, Thomas's credentials would be renewed for eight months, but this was conditioned on his agreeing to the following terms: (1) participate in bi-weekly meetings with the director of perioperative services (Gibbs) and one other nursing leader to discuss interactions with nursing staff; (2) participate in weekly meetings with a coach for the first two months with frequency thereafter as approved by the chair of the JCC; (3) provide a monthly report to the JCC on his implementation of the above conditions; and (4) attend a one-weekend program for distressed physicians on improving inter-professional communication. Dr. Britt Nelson, President of Cook Children's Physician Network, wrote a follow-up letter to Thomas on February 26, 2020, notifying him that if he did not send written confirmation of his agreement to these terms by February 28, his credentials would not be renewed, and his employment at Cook would end. Thomas did not do so; consequently, his employment at Cook terminated.

On November 25, 2020, Thomas filed suit against Cook alleging discrimination, retaliation, and hostile work environment under Title VII and Texas law. Cook moved to dismiss the complaint. The district court granted Cook's motion in part, dismissing Thomas's hostile-work-environment claim for failure to state a claim. After discovery, Cook moved for summary judgment on Thomas's discrimination and retaliation claims. Concluding that Thomas failed to present a prima facie case of discrimination or

No. 22-10535

retaliation, the district court granted summary judgment in favor of Cook. Thomas filed a timely notice of appeal.

## II.  DISCUSSION

On appeal, Thomas asserts that the district court erred in dismissing his hostile-work-environment claim under Rule 12(b)(6) and in granting summary judgment in favor of Cook as to his racial discrimination and retaliation claims.

### A.  Hostile-Work-Environment Claim

This Court reviews de novo the district court's dismissal for failure to state a claim under Rule 12(b)(6).[4]  We accept "all well-pleaded facts in the complaint as true and viewed in the light most favorable to the plaintiff."[5]

Title VII "makes it unlawful for employers to require people to work in a discriminatorily hostile or abusive environment."[6]  A hostile-work-environment claim "necessarily rests on an allegation that an employer has created a working environment heavily charged with discrimination."[7]  "To be actionable, the work environment must be 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'"[8]  To determine whether a work environment is objectively offensive, courts must consider "the totality of the circumstances," including: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically

---

[4] *Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681, 685 (5th Cir. 2017).

[5] *Raj v. La. State Univ.*, 714 F.3d 322, 330 (5th Cir. 2013) (citation omitted).

[6] *West v. City of Hous., Tex.*, 960 F.3d 736, 741 (5th Cir. 2020).

[7] *Raj*, 714 F.3d at 330-31 (internal quotation marks and citation omitted).

[8] *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance."[9]

Thomas argues that, contrary to the district court's determination, the following alleged actions/inactions set forth a facially plausible hostile-work-environment claim: Cook's reliance on "19 events reports and two patient complaints that were false or unsubstantiated," Cook's deviation from its policies and procedures, Cook's withholding of information about the event reports and then expecting him to explain what had occurred, Cook's refusal to answer Thomas's questions when asked in writing, Cook's staging of "sham meetings" to be used as pretext, and Cook's "imposing ever-changing and exclusive terms and conditions" for Thomas to remain employed. In essence, Thomas submits that Cook's handling of the event reports and patient complaints filed against him in the context of his credentialing review between August 2019 and February 2020 constituted harassment.

However, Thomas's argument is unavailing in light of the allegations in his complaint. Specifically, Thomas's complaint fails to plausibly allege that the above actions (except for possibly one alleged remark) constituted harassment *based on his race*.[10] And, the one remark relating to race does not make out a hostile-work-environment claim. Specifically, Thomas alleges that Perez stated during a meeting with him, Burt, and Uffman that "[a]s an African American male [Thomas would] have to work twice as hard" at Cook. Although this Court has held that the single use of "an unambiguously

_____

[9] *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007).

[10] *See Raj*, 714 F.3d at 330-31 (affirming the district court's dismissal of plaintiff's hostile-work-environment claim because the plaintiff did "not allege any facts that link the alleged harassment with his race or national origin" and therefore failed "to plead a claim of hostile work environment").

racial epithet" by a supervisor in the presence of subordinates can support a hostile-work-environment claim, Perez's alleged remark does not meet that standard.[11]

Because we "do not consider . . . incidents of harassment not based on race," Thomas's complaint has failed to plausibly allege facts that demonstrate he was repeatedly subjected to harassment based on his race.[12] Therefore, we affirm the district court's Rule 12(b)(6) dismissal of Thomas's hostile-work-environment claim for failure to state a claim.

## B. Racial Discrimination Claim

This Court reviews grants of summary judgment de novo.[13] Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[14] The district court determined that Thomas presented evidence to satisfy the first two prongs of the familiar *McDonnell Douglas Corp. v. Green*[15] framework—he was a member of a protected class and qualified for the position at issue. The district court, however, determined that Thomas failed to present evidence creating a genuine dispute as to the third and fourth prongs—that he suffered an adverse employment action and that Cook treated "similarly situated" employees outside of his protected class (i.e.,

---

[11] *Woods v. Cantrell*, 29 F.4th 284, 287 (5th Cir. 2022) (holding that a single incident of harassment, if sufficiently severe, can state a hostile-work-environment claim); *Faragher*, 524 U.S. at 788 (noting that "isolated incidents" (unless extremely serious) are insufficient to assert an objectively hostile work environment).

[12] *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 654 (5th Cir. 2012).

[13] *West*, 960 F.3d at 740.

[14] Fed. R. Civ. P. 56(a).

[15] 411 U.S. 792, 802 (1973).

"comparators") more favorably. We agree that Thomas's prima facie case fails due to lack of a comparator.

To survive summary judgement regarding a comparator, Thomas had to show that there were genuine disputes that he and his alleged comparators "(1) held the same job or responsibilities; (2) shared the same supervisor or had their employment status determined by the same person; (3) have essentially comparable violation histories; and (4) have engaged in conduct nearly identical to the conduct that resulted in" the imposition of conditions for the renewal of credentials for a shortened reappointment period.[16]

Thomas proffered two comparators, whom the district court rejected: Dr. Jose Iglesias, a White, Hispanic male, and Dr. John Pfaff, a White male. The district court determined that Iglesias did not qualify as a comparator for two reasons. First, Iglesias was a medical director and subject to a different reporting structure. Second, the event reports filed against Iglesias were not "nearly identical" in quantity or quality. As to the first reason, Thomas argues that Iglesias's position is not relevant because the JCC had oversight over both of them for renewal of credentials, which is the issue at hand. Thomas makes a valid point here,[17] but he fails to show error in the second reason the district court rejected Iglesias as a comparator—that the event reports filed against Iglesias were not "nearly identical" in quantity or quality.[18]

---

[16] *Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 322 (5th Cir. 2021) (internal quotation marks and citation omitted).

[17] Thomas and Iglesias need only have "shared the same supervisor *or* had their employment status determined by the same person." *Id.* (emphasis added).

[18] *West*, 960 F.3d at 740 ("We have defined 'similarly situated' narrowly, requiring the employees' situation to be 'nearly identical.'") (citation omitted).

No. 22-10535

Thomas argues that Iglesias was promoted in 2011 despite receiving ten event reports during a two-year credentialing period between 2009 and 2011, and then received additional event reports after his promotion.[19] This number of event reports is not "nearly identical" in quantity to the amount Thomas received between 2017 and 2019. To the contrary, Thomas received almost double the event reports (nineteen), as well as two patient complaints during the two-year credentialing period relevant here. Thomas states that Iglesias received another eleven reports against him from 2015 to 2017. Again, that number is just over half the amount Thomas received during the relevant two-year period.[20]

Similarly, the other comparator proffered by Thomas, Dr. John Pfaff, did not have event reports "nearly identical" in quantity to the amount Thomas received in a two-year period. Pfaff had twelve event reports (seven less than Thomas) and three patient complaints (one more than Thomas) over a two-year period from 2018 to 2020.

In sum, the district court did not err in determining there was no genuine dispute that Iglesias and Pfaff did not qualify as comparators and

_____

[19] To the extent that Thomas may possibly be arguing that he was discriminated against during this time period because Iglesias received more event reports between 2009 and 2011 than he did, any such claim has long expired. *See* 42 U.S.C. § 2000e-5 (requiring charge be filed with EEOC within 180 days, or 300 days if plaintiff initially instituted proceedings with a state or local agency).

[20] Although Thomas makes additional arguments regarding Iglesias in his reply brief, this Court usually does not consider arguments made for the first time in a reply brief. *See Dixon v. Toyota Motor Credit Corp.*, 794 F.3d 507, 508 (5th Cir. 2015) (noting that arguments raised for the first time in a reply brief are waived). Moreover, Thomas's arguments have no merit. First, no patient complaints were filed against Iglesias, and secondly, the records from the PAC meetings indicate that Iglesias received fourteen event reports "over the years," which was over a three-year period. In any event, Iglesias was not treated more favorably than Thomas because it was recommended that he also receive formal coaching to address the problems prompting the fourteen reports.

No. 22-10535

that, consequently, Thomas could not establish a prima facie case as to his racial discrimination claim.[21]    Therefore, we affirm the district court's summary judgment dismissing Thomas's racial discrimination claim.

## C. Retaliation Claim

To make a prima facie case for retaliation, Thomas must show: (1) that he engaged in protected activity; (2) that Cook took adverse action against him;[22] and (3) that a causal connection exists between the protected activity and the adverse action.[23]  An employee engages in a protected activity if he "oppose[s] any practice made an unlawful employment practice by Title VII."[24]  "If an adverse employment action occurs within close temporal proximity to protected activity known to the employer, a plaintiff will have met [his] burden to establish a prima facie case of retaliation."[25]

---

[21] Because Thomas was unable to establish a prima facie case of racial discrimination, we need not address his arguments bearing on pretext for discrimination, i.e., whether Cook deviated from its policies and relied on false and unsubstantiated event reports in order to discriminate against him. *See Morris v. Town of Independence*, 827 F.3d 396, 403 (5th Cir. 2016) ("Because we hold that [Plaintiff] has not met her burden to set forth a prima facie case of racial discrimination, we need not discuss the parties' remaining arguments regarding pretext.").

[22] "For purposes of Title VII's anti-retaliation provision, the Supreme Court has held that an adverse employment action is defined slightly more broadly than the term is defined in the employment discrimination context." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019), *abrogated on other grounds by Hamilton v. Dallas Cnty.*, No. 21-10133, 2023 WL 5316716 (5th Cir. Aug. 18, 2023) (en banc). Specifically, a plaintiff seeking to establish a retaliatory adverse employment action "must show that a reasonable employee would have found the challenged action materially adverse." *Id.* (citation omitted).

[23] *Id.*

[24] *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (internal quotation marks and citation omitted).

[25] *Badgerow v. REJ Prop., Inc.*, 974 F.3d 610, 619 (5th Cir. 2020) (citation omitted).

No. 22-10535

If the plaintiff makes this prima facie case, the burden then shifts to the defendant "to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action."[26] If the defendant meets its burden of production, the ultimate burden of persuasion is on the plaintiff to show that "the employer's proffered rationale was pretextual and that engaging in the protected activity was the but-for cause of the adverse employment action."[27] Specifically, "a[t] the pretext stage, the plaintiff must offer evidence that the adverse action would not have occurred but for his employer's retaliatory motive."[28]

### (1) The District Court's Decision

The district court determined that Thomas established the first and second elements of a prima facie case of discriminatory retaliation. Specifically, as undisputed by Cook, Thomas engaged in protected activity when he complained of racial discrimination. As to the second element, the district court noted the broader definition of "adverse employment action" applicable in retaliation claims. Under the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, an adverse employment action can include actions that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[29] We agree with the district court that factual disputes exist "as to whether requiring a physician to attend counseling, meetings, and a seminar would, in fact,

---

[26] *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

[27] *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 167 (5th Cir. 1999); *see also Univ. of Tex. Sw Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (announcing that "retaliation claims must be proved according to traditional principles of but-for causation").

[28] *Badgerow*, 974 F.3d at 619 (internal quotation marks and citation omitted).

[29] 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted).

dissuade that employee from complaining of discrimination" and that "[a] shortened reassignment period very well may dissuade a physician in Thomas's circumstances from engaging in protected activity."[30]

As to the third prong, however, the district court determined that Thomas's prima facie case failed because he was unable to show a causal connection between the protected activity and the adverse action. Thomas points out that in addition to complaining to the director of employee relations (Valerie Warren) in September 2018, which the district court considered as Thomas's protected activity, he also sent numerous letters and emails between September 2019 and February 2020, complaining of unlawful discrimination and/or retaliation. Assuming without deciding that Thomas established a prima facie case, we move on to consider the next step in the burden-shifting framework—whether Cook had legitimate, nonretaliatory reasons for its actions. We agree with the district court that the number of event reports and patient complaints filed against Thomas constituted legitimate, nonretaliatory reasons for Cook's actions. After having determined that Cook set forth legitimate, nonretaliatory reasons, the district court should have then continued with the last step in the burden-shifting framework, whether (as Thomas argued) those reasons were pretext for retaliation for his protected activities. Because we can nonetheless affirm the district court's summary judgment based on any ground presented to the district court and supported by the record, we address the pretext issue below.[31]

_____

[30] Because adverse employment action under the retaliation statute is defined more broadly, Cook's challenge to this prong is unavailing. *See Welsh*, 941 F.3d at 826.

[31] *See Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008) ("Even if this court disagrees with the reasons given by the district court, it may affirm a grant of summary judgment on any grounds supported by the record and presented to the court below."

No. 22-10535

### (2) Pretext for Retaliation

Retaliation claims under Title VII "must be proved according to traditional principles of but-for causation."[32]  Specifically, "to survive a motion for summary judgment, a plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the adverse employment action but for the protected activity."[33]  Cook argues that it would have taken the same actions even if Thomas had not made any complaints about discrimination or retaliation.  After reviewing the record, we agree that Thomas was unable to produce evidence to survive Cook's motion for summary judgment on this issue.

Thomas complained of racial discrimination in a September 27, 2019, email responding to the fact that the JCC had referred him to the PAC and was reappointing him for only ninety days.  There is no evidence that Cook retaliated against Thomas for his complaining in that email.  If anything, as Burt testified, Thomas was treated more favorably than other physicians.  Specifically, three delegates of the PAC (Burt, Uffman, and Perez) volunteered to meet with Thomas to discuss his concerns and thereafter conducted two meetings.  There is also evidence that it was routine for the JCC to reappoint a physician for a shortened period and to refer his case to the PAC when event reports regarding the physician had not been addressed by the PAC, as was done in Thomas's case early on in his career.

_____

(quoting *Berquist,* 500 F.3d at 349; *Leverette v. Louisville Ladder Co.,* 183 F.3d 339, 342 (5th Cir.1999)).

[32] *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020) (citation omitted).

[33] *Id.* (internal quotation marks and citation omitted).

In an October 17, 2019, letter, Thomas alleged that during one of his meetings with the delegates, Perez stated she understood that Thomas would have to work twice as hard at Cook as "an African American male." Thomas further alleged that Uffman told him, "We want you here at Cook but these emails aren't making it easy." But, these comments do not create a genuine issue that the PAC would not have recommended that Thomas receive counseling and meet weekly with Gibbs in the absence of Thomas's complaints of discrimination and retaliation.[34] As noted by the district court, the counseling recommendation was consistent with the way Cook handled event reports filed about Thomas's behavior early on his career, long before he ever engaged in protected activity. Moreover, the record reflects that the JCC routinely refers physicians for counseling/coaching to improve interactions with staff. Furthermore, there is no evidence that the weekly meetings with Gibbs would not have been recommended had Thomas not engaged in protected activity. To the contrary, the record evidence shows that the weekly meetings were recommended in response to Thomas's frustration with Cook's failure to address event reports in a timely fashion.

Thomas contends that he actually accepted the PAC's recommendations orally, but that Cook retaliated against him for protected activity when Reaves required him to *sign* a letter agreement setting forth the PAC's recommendations. Reaves testified in his deposition that Thomas in fact secured a coach (Sola Winley) and that Thomas never refused to meet with Gibbs. But, Reaves still sent Thomas a letter on January 9, 2021, requiring him to sign a letter agreement setting forth the PAC's

---

[34] *See, e.g., Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999) (stating "the ultimate issue on summary judgment is whether [the plaintiff] produced evidence which could support a finding that she would not have been fired in the absence of her having engaged in protected conduct").

recommendations.  Reaves's explanation for doing so was because "after all of the communication breakdowns and repeated lack of commitment, [he] felt that it was appropriate to have written confirmation so that there would be no misunderstandings."

Under these circumstances, the signature requirement does not constitute adverse action, even under the broader definition of that term for purposes of retaliation claims.  Thomas had already agreed to the PAC's recommendations orally and had already implemented one of the recommendations by hiring a coach.  The letter agreement itself neither imposed any additional requirements nor provided for any waiver of Thomas's rights.

On February 20, 2020, after Thomas attended a meeting with the JCC, Cook sent Thomas a letter renewing his credentials for eight months.  However, Thomas had to agree to the following conditions:  (1) participate in bi-weekly meetings with Gibbs and one other nursing leader to discuss interactions with nursing staff; (2) participate in weekly meetings with a coach for the first two months with frequency thereafter as approved by the chair of the JCC; (3) provide a monthly report to the JCC on his implementation of the above conditions; and (4) attend a one-weekend program for distressed physicians on improving inter-professional communication.

Although the PAC previously did not require attendance at a weekend program, Thomas is unable to show that but-for his complaints of discrimination and retaliation, this requirement would not have been imposed.  Specifically, Cook's letter states that another event report regarding Thomas's conduct was filed on January 27, 2020, and that Thomas had failed to respond to the JCC's request for an explanation of the event.  Consequently, Thomas is unable to show that but-for his complaints of

No. 22-10535

discrimination and retaliation, Cook would not have imposed the additional requirement. Based on the foregoing, the district court did not err in granting summary judgment in favor of Cook, dismissing Thomas's retaliation claim.

## III. CONCLUSION

For the above reasons, the district court did not err in dismissing Thomas's hostile-work-environment claim for failure to state a claim under Rule 12(b)(6) and in dismissing Thomas's racial discrimination and retaliation claims on summary judgment. Accordingly, the district court's judgment is AFFIRMED. Appellees' motion to strike reply brief is DENIED.

JUDGMENT AFFIRMED; MOTION DENIED.