# United States Court of Appeals for the Fifth Circuit

---

No. 24-20554

---

United States Court of Appeals
Fifth Circuit

**FILED**

March 26, 2026

Lyle W. Cayce
Clerk

Karen Green,

*Plaintiff—Appellant*,

*versus*

HCTec Partners, L.L.C.,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-2559

---

Before Wiener, Engelhardt, and Oldham, *Circuit Judges*.

Per Curiam:[*]

After her employment was abruptly terminated, Plaintiff-Appellant Karen Green, an African American female, sued her former employer, Defendant-Appellee HCTec Partners, LLC, alleging race and sex discrimination (disparate treatment and a hostile work environment) and retaliation, in violation of Title VII and 42 U.S.C. § 1981. Granting HCTec's

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-20554

motion for summary judgment, the district court dismissed Green's claims. For the reasons discussed herein, we AFFIRM.

I.

In support of her race and sex discrimination claims, alleging disparate treatment and the creation of a hostile work environment, Green contends that her African American male supervisor, Bernard Rush, treated her differently than her white male counterpart, Ryan Noland, during the almost four months that she was employed as a "Tier 2 Applications Manager" at HCTec.[1] Then, mid-day on May 13, 2021, Rush suddenly and unexpectedly fired Green—purportedly because of her inappropriate communications earlier that same day—without any prior warning, discussion of the bases for Rush's objections to her communications, and/or opportunity for remediation (via counseling, training, education, and/or performance improvement plan), notwithstanding HCTec's general policy of progressive discipline.

In contrast, Green contends, Noland previously had received only reprimands and counseling from Rush regarding (Noland's) objectional communications. Green adds that, after her termination, her duties were shared by Noland, HCTec's Client Services Manager (a white female), and certain Team Leads until another HCTec employee, an African American female, undertook management of the teams in August 2021 under the title of "interim manager."[2]

_____

[1] In January 2021, Green was promoted to a "Tier 2 Applications Manager." Since April 2018, Green held the position of "Team Lead." Green worked under Rush's supervision in both positions.

[2] This employee had been a lead analyst for one of the teams that Green previously managed. Personnel documentation submitted by HCTec reveals that she was offered the

In support of her retaliation claim, Green links Rush's termination decision to her having previously reported his disparate treatment, and her belief that the disparity was motivated by her race (African American) and sex (female) in comparison with Noland's race (white) and sex (male), to Human Resources (HR) representative Tracye Mayolo (a white female) and Rush's supervisor, Rob Dreussi. Green asserts that her February 3, 2021 report to HR—her Title VII "protected activity"—was the "but for" cause of her May 13, 2021 termination. In other words, she contends that she would not have been terminated in May 2021 if she had not made the February 2021 accusation against Rush.

On appeal, Green challenges the correctness of the district court's *McDonnell Douglas* "pretext for discrimination" and "pretext for retaliation" assessments. She maintains that the record contains sufficient circumstantial evidence for a reasonable jury to conclude (infer) that HCTec's proffered reasons for her termination were not, in fact, the real reasons that she was fired, but instead were pretexts for unlawful discrimination and/or retaliation by Rush. Green also challenges the district court's dismissal of her hostile work environment claim.

## II.

We review orders granting summary judgment *de novo*, applying the same standards as the district court. *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 215–16 (5th Cir. 2024). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of material fact is genuine if a reasonable jury could return a verdict

---

position of "Tier 2 Applications Manager" (the same title Green had held) on September 24, 2021, and accepted the position on October 1, 2021.

for the nonmovant." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019) (citation omitted). "Once a movant who does not have the burden of proof at trial makes a properly supported motion, the burden shifts to the nonmovant to show that a summary judgment should not be granted." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citation omitted). A nonmovant opposing summary judgment "may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Id.* "[U]nsubstantiated assertions are not competent summary judgment evidence." *Id.* Rather, the nonmovant must "identify specific evidence in the record and [] articulate the precise manner in which that evidence supports his or her claim." *Id.* "We view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor." *Brown v. City of Houston*, 65 F.4th 774, 777 (5th Cir. 2023) (citation omitted).

### A. Disparate Treatment Discrimination and Retaliation

A plaintiff may prove claims asserted under Title VII and § 1981 using either direct evidence or circumstantial evidence. Absent direct evidence of discrimination/retaliation, this court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). *See, e.g., January v. City of Huntsville*, 74 F.4th 646, 653 (5th Cir. 2023) (addressing retaliation claims); *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022) (addressing discrimination claims). Under the *McDonnell Douglas* framework, a plaintiff asserting a discrimination claim bears the initial burden of establishing a prima facie case of discrimination. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021). If the plaintiff establishes a prima facie case, "the burden of production shifts to [the defendant] to proffer a

legitimate, nondiscriminatory reason for [its] action." *Id.*[3] If the defendant meets that burden, "the presumption of discrimination disappears," and the plaintiff "must then produce substantial evidence indicating that the [defendant's] proffered . . . reason is a pretext for discrimination." *Id.* at 281 (quoting *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016)). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* at 283 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003) (internal quotation marks omitted)). Of course, "[i]n the context of a summary judgment proceeding, the question is *not* whether the plaintiff *proves* pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext." *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (emphasis added) (quoting *Thornbrough v. Columbus and Greenville R.R. Co.*, 760 F.2d 633, 646 (5th Cir. 1985), *abrogated in part on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000), the Supreme Court confirmed that a plaintiff *may* establish pretext through evidence of disparate treatment or, in some instances, by showing the defendant's proffered explanation is false or unworthy of credence. Since *Reeves*, this court's jurisprudence has acknowledged and reiterated that point. *See, e.g.*, *Watkins*, 997 F.3d at 283; *Laxton*, 333 F.3d at 578; *see also Owens*, 33 F.4th at 826 ("[The plaintiff] may meet her burden through use of various forms of circumstantial evidence, including evidence of disparate treatment or evidence tending to show that [the employer's] 'explanation is unworthy of credence.'" (quoting *Reeves*, 530 U.S. at 147)). "An

---

[3] *See Watkins*, 997 F.3d at 282 (The defendant "must articulate a nondiscriminatory reason with sufficient clarity to afford [the plaintiff] a realistic opportunity to show that the reason is pretextual." (citation modified)).

explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Caldwell*, 850 F.3d at 242 (quoting *Laxton*, 333 F.3d at 578).

But, importantly, this court's discrimination cases also recognize that "[t]he ultimate determination, in every case, is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer *discrimination*." *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000) (emphasis added). Thus, "the evidence must permit a *reasonable* inference that [the employer's] false reason was pretext for the true, *discriminatory*, reason." *Owens*, 33 F.4th at 833 (emphasis added); *see also St. Mary's Honor Ctr.*, 509 U.S. at 515 "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason. (emphasis in original)); *Reeves*, 530 U.S. at 147 ("It is not enough to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (citation modified)); *Owens*, 33 F.4th at 833 (providing sufficient evidence for a jury to disbelieve an employer's explanation is not necessarily enough).

Accordingly, for evidence of falsity alone to suffice, that is, "for the trier of fact to infer the ultimate fact of discrimination solely from the falsity of the employer's explanation, the evidence of falsity must be of sufficient nature, extent, and quality to make the inferential leap to discrimination a rational one." *Owens*, 33 F.4th at 826 n.7 (citation modified); *see also Crawford*, 234 F.3d at 903 ("The determination must be made on a case-by-case basis, depending on the nature, extent, and quality of the evidence, as to whether a jury could reasonably infer discrimination."); *id.* ("It is . . . possible for a plaintiff's evidence to permit a *tenuous* inference of pretext and yet be insufficient to support a *reasonable* inference of discrimination." (emphasis added)).

The same rules apply (in the context of a retaliation claim) where the relevant inference to be drawn is retaliation (for the plaintiff's protected activity) rather than discrimination. *See, e.g.*, *January*, 74 F.4th at 653; *Owens*, 33 F.4th at 826; *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577–81 (5th Cir. 2020). Again, the falsity of the defendant's proffered legitimate, non-retaliatory reason is relevant but not always determinative. *January*, 74 F.4th at 654 ("[I]n an appropriate case, a factfinder may infer the ultimate fact of retaliation from the falsity of the employer's explanation." (quoting *Brown*, 969 F.3d at 577–78)). In deciding whether that inference is warranted, "numerous factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Id.* (quoting *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1002 (5th Cir. 2022)). One relevant factor is the proximity of time between the protected activity and the termination. "[A] combination of suspicious timing with other significant evidence of pretext[] can be sufficient to survive summary judgment." *January*, 74 F.4th at 655 (quoting *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015)).

## B. Hostile Work Environment Discrimination

In addition to protecting employees from race, sex, and national origin discrimination in the workplace, Title VII also makes it unlawful for employers to require "people to work in a discriminatorily hostile or abusive environment." *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also, e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002) ("Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment."); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) ("We agree that a plaintiff

may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." (citation modified)).

To survive summary judgment on a hostile work environment claim based on race or sex discrimination, a plaintiff must show that (1) the plaintiff is a member of a protected class; (2) the plaintiff suffered unwelcomed harassment; (3) the harassment was based on the plaintiff's membership in a protected class; (4) the harassment "affected a term, condition, or privilege of employment"; and (5) "the employer knew or should have known" about the harassment and "failed to take prompt remedial action." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 433 (5th Cir. 2022) (quoting *West v. City of Houston*, 960 F.3d 736, 741 (5th Cir. 2020)).

But "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor*, 477 U.S. at 67 (quoting *Rogers v. E.E.O.C.*, 454 F.2d 234, 238 (5th Cir. 1971) (quoting 42 U.S.C. § 2000e–2(a)(1))).[4] "For harassment to affect a term, condition, or privilege of employment, it 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Wantou*, 23 F.4th at 433 (quoting *West*, 960 F.3d at 741–42); *see also Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013) ("[T]he plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered."). The environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."

---

[4] Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

*Wantou*, 23 F.4th at 43 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

"The totality of the employment circumstances determines whether an environment is objectively hostile." *Id.* (quoting *Harris*, 510 U.S. at 23). Although no single factor is determinative, pertinent considerations are (1) "the frequency of the discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23).

## III.

Regarding her disparate-treatment discrimination and retaliation claims, Green argues that the district court reversibly erred in granting HCTec's motion because, she contends, the district judge failed to draw all reasonable inferences in her favor and ignored evidence that, viewed in context, would permit a reasonable factfinder to conclude that HCTec's proffered reasons for her termination actually are implausible cover-ups for Rush's discriminatory and/or retaliatory motives. In support of her assertion that Rush's decisions were made on the basis of prohibited motives, rather than good-faith business judgment, Green emphasizes the timing and circumstance of her abrupt termination—which occurred less than four months after she began the managerial position *and* approximately two and one-half months after she made her report to HR.

Green also challenges the factual accuracy and plausibility of the proffered reasons for her termination. Specifically, she disputes that any of her May 13 communications (via email or Microsoft Teams "Chats") were

9

"inappropriate" or "insubordinate."[5] Regarding the assertion that she made inappropriate stereotypical comments about one of her male subordinates, Hasheem Reddick, based on assumptions regarding his national origin and religious and/or cultural background, Green argues that her May 13 Teams Chat messages shows that she was merely relaying another (subordinate) employee's concerns about Reddick. But, as the district court concluded, Green does not controvert Rush's assertion (in his declaration and deposition testimony) that she made inappropriate comments about Reddick's culture and ethnicity during a phone call with Rush.[6] And, though certainly not the only reasonable interpretation, a reasonable person could construe the Teams Chat messages to mean that *Green* was the person suggesting that Reddick might be confrontational because she (Green) is female.[7] Importantly, the court's inquiry is "whether [Rush's] *perception* of [Green's] performance, accurate *or* not, was the real reason for her termination." *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001) (emphasis added) (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408–09 (5th Cir. 1999); *see also Shackelford*, 190 F.3d at 408 ("Merely disputing [the defendant's] assessment of [the plaintiff's] work performance will not necessarily support an inference of pretext.").

To explain the reasons for Rush's decision to terminate Green's employment, HCTec also points to Green's email communications with a

---

[5] Careful review of the parties' submissions reveals that the entirety of the May 13 communications between Green and Rush that preceded Rush's "you're fired" telephone call to Green (rather than only the single "I am done" message referenced in Green's complaint) must be considered.

[6] *See* Transcript of June 15, 2023 Deposition of Bernard Rush ("Rush Dep.") at 24–25 (ROA.781/ROA.932–33); August 7, 2024 Declaration of Bernard Rush ("Rush Decl.") ¶ 9 (ROA.1229).

[7] *See* Karen Green May 13, 2021, 9:55 A.M. Message (ROA.790/ROA.875).

client's IT director, Ryan Birkmaier, concerning the number of HCTec analysts to be assigned to the client's upcoming required software validation. According to Rush's declaration and deposition testimony, he characterized the communications as insubordinate and inappropriate.[8] Objecting to Rush's characterization, Green maintains that she "responded via email to Centura [the client] in accordance with what [] Rush instructed, whereby [she] informed Centura that only one analyst was needed and further offered a second analyst if Centura needed one."[9] Significantly, however, Green does *not* rebut Rush's assertion that she was informed at some point (apparently by telephone) that Rush had approved the assignment of a second analyst.

Additionally, the email "to Centura" referenced in Green's declaration presumably refers to her 11:49 A.M. email to the client's IT Director, Ryan Birkmaier.[10] Notably, Green does *not* address the content or (arguably begrudging) tone of her later, 12:47 P.M. email,[11] which was directed to HCTec's Client Services Manager Brandi Brock and others, including the client's IT Director (Birkmaier), *and* followed Brock's 11:15 A.M. email to Green and others, also including Birkmaier, reiterating the client's request for a second analyst and (essentially) directing Green to assign a second

---

[8] *See* Rush Dep. at 24–29, 33–34, 44–48 (ROA. 93–37, 941–42, 952–56); Rush Decl. ¶¶ 10–12 (ROA.1229–30); *see also* Tracye Mayolo May 13, 2021, 2:01 P.M. Email to Diane Snyder (ROA.800–01).

[9] *See* July 31, 2024 Declaration of Karen Green ("Green Decl.") ¶ 22 (ROA.850); *see also* Karen Green May 13, 2021, 11:49 A.M. Email (ROA.793–94).

[10] *See* Karen Green May 13, 2021, 11:49 A.M. Email (ROA.793–94).

[11] *See* Karen Green May 13, 2021, 12:47 P.M. Email (ROA.792) (stating "For the record, the issue last time and only one time" and, finally, "If you want, please add Maria Rivera.").

analyst.[12] Considering Rush's own 12:50 P.M. message to Green,[13] one—if not both—of these emails seemingly followed Rush's approval of a second analyst (and Green fails to assert that they did not) such that Rush reasonably could have found Green's later message highly objectionable, particularly given his stated concern (also unrebutted) that HCTec's then-ongoing contract negotiations with the client could be adversely impacted. Finally, Green's untitled May 13 "I am done" Teams message to Rush (particularly if Rush thought it related to Centura's analyst assignment) could have been the proverbial "last straw" giving rise to Rush's termination decision.[14]

In sum, a *de novo* review of the record reveals that the district court correctly granted summary judgment regarding Green's disparate-treatment discrimination claims because she failed to rebut several of HCTec's legitimate, business-related reasons for firing her. Where Green attempted to rebut HCTec's legitimate reasons for her termination, she at best shows that reasonable minds can disagree with HCTec's rationale, not that the rationale was pretextual or false.

Green's retaliation claim is a harder call given the relatively close (but not unusually close) time proximity between Green's February 3, 2021 protected activity (informally reporting Rush's alleged discriminatory conduct (disparate treatment on the basis of race and gender) to HR *and* Rush's supervisor) and her May 13, 2021 abrupt, no-prior-warning, no-

---

[12] *See* Brandi Brock May 13, 2021, 11:17 A.M. Email (ROA.793) ("At [the client's] request, please have a separate resource assigned to do the validation . . . so that we can get this done as efficiently as possible.").

[13] *See* Bernard Rush May 13, 2021, 12:50 P.M. "High Priority" Message (ROA.803) ("Karen. Please do not send any more emails to the client about the Validation for Epic Su's.").

[14] *See* Karen Green May 13, 2021, 11:32 A.M. Message (ROA.886).

second-chances termination. Ultimately, however, we are satisfied that the district court likewise correctly concluded that Green failed to satisfy her evidentiary burden relative to that claim. Although *we* might reasonably think that Rush overreacted in immediately terminating Green based on her May 13, 2021 communications, particularly without giving her a fulsome opportunity to defend herself and/or clarify any ambiguities or mistaken conclusions, it is well-established that courts are *not* charged with fairness oversight of businesses' human resources decisions. Employers are entitled to be unreasonable as long as they are not unreasonable in a manner that is racist or sexist, and the employee's legally "protected activity" is not the but-for cause of that unreasonableness. And, again, the court's inquiry is "whether [Rush's] *perception* of [Green's] performance, accurate or not, was the real reason for her termination." *Evans*, 246 F.3d at 355.

## IV.

In rejecting Green's position regarding her hostile work environment claim, the district court reasoned that the conduct she alleged—being ignored and given a heavier workload than her counterpart—generally is not sufficiently severe or pervasive to create an actionable hostile work environment (unless accompanied by sufficient evidence of a sex or race-based animus). Additionally, Green neither rebutted Rush's non-discriminatory explanations for these behaviors nor established that either conduct occurred subsequent to her February 3 report to HR. Green likewise did not contest Rush's assertion that Green never informed Rush that his allocation of her and Noland's work assignments necessitated that she work substantially more hours than Noland or were otherwise unfair. Nor has Green put forth evidence creating a reasonable inference that Rush was otherwise aware of a workload disparity and yet did nothing to remedy the matter. On this record, we again agree with the district court's evidentiary assessment.

No. 24-20554

V.

Arriving at the same conclusions as the district court, we AFFIRM the summary judgment dismissing Green's claims with prejudice.

No. 24-20554

Andrew S. Oldham, *Circuit Judge*, concurring in the judgment:

The majority opinion faithfully and carefully applies circuit precedent. I write separately to emphasize two points. First, it is unclear why *McDonnell Douglas*'s burden-shifting framework should apply at summary judgment. And second, Green's so-called "intersectional" claims do not sound in § 1981 and should not sound in Title VII.

I

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court set out a three-part, burden-shifting framework for assessing employment discrimination claims. The underlying idea was that it is difficult to make sense of employment discrimination claims based on circumstantial evidence, so a three-step framework is a useful way to sift through such cases. *See Hittle v. City of Stockton*, 145 S. Ct. 759, 759–61 (2025) (Thomas, J., dissenting from the denial of certiorari) (explaining the framework). Notably, the Court did not base this decision on a particular body of law. *Id.* at 760. As the Court later described, the framework was instead designed as "a sensible, orderly way to evaluate" evidence in discrimination suits. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

While *McDonnell Douglas* was designed to bring clarity, it has caused confusion. *See, e.g.*, *Walton v. Powell*, 821 F. 3d 1204, 1210 (10th Cir. 2016) (Gorsuch, J.) (noting *McDonnell Douglas* "has proven of limited value" and causes "confusion and complexities"); *Brady v. Off. of Sergeant at Arms*, 520 F. 3d 490, 494 (D.C. Cir. 2008) (Kavanaugh, J.) (explaining that *McDonnell Douglas* is a test that creates "a largely unnecessary sideshow" that "spawn[ed] enormous confusion").

One particularly confusing question is whether *McDonnell Douglas* applies at the summary judgment stage. *See Hittle*, 145 S. Ct. at 761–62 (Thomas, J., dissenting). There are good reasons to think it does not. For

one, the eponymous case was not a summary judgment case. The district court was resolving the "ultimate question" of the defendant's discrimination after a bench trial. *Tex. Dept. of Cmty. Affs. v. Burdine*, 450 U. S. 248, 253 (1981); *Green v. McDonnell-Douglas Corp.*, 299 F. Supp. 1100, 1102 (E.D. Mo. 1969). What's more, if the idea behind *McDonnell Douglas* is that it ferrets out whether a violation actually occurred, that question is distinct from the summary judgment standard: whether a plaintiff created a genuine dispute of material fact on that issue. Fed. R. Civ. P. 56. Worse, courts routinely treat *McDonnell Douglas* as requiring an even higher standard: "substantial evidence" that a defendant's actions were a pretext for discrimination. *Ibanez v. Tex. A&M Univ. Kingsville*, 118 F.4th 677, 682–83 (5th Cir. 2024). That substantive standard is certainly higher than the summary judgment rule that a plaintiff need only create a genuine dispute of material fact. *Celotex Corp v. Catrett*, 477 U.S. 317, 322–23 (1986).

For these reasons, a growing number of judges have recognized that applying *McDonnell Douglas* at summary judgment makes little sense. *See Tynes v. Fla. Dept. of Juv. Just.*, 88 F. 4th 939, 951–954 (11th Cir. 2023) (Newsom, J., concurring); *Hittle*, 145 S. Ct at 761–63 (Thomas, J., dissenting). I join their skepticism.

Nonetheless, the majority is correct when it affirms the grant of summary judgment. That's because Green has not put forward any evidence of sex- or race-based discrimination. And while Green has shown that she was fired about two-and-one-half months after reporting alleged discrimination, her retaliation claim also fails. Courts routinely recognize that "a short period of time between the filing of a charge of discrimination and an allegedly retaliatory action is rarely enough by itself to create a triable issue" under Title VII, such as would preclude summary judgment. *Lang v. Ill. Dep't of Child. & Fam. Servs.*, 361 F.3d 416, 419 (7th Cir. 2004). And on summary judgment, "mere temporal proximity is not enough to establish a genuine

issue of material fact." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) (quotation omitted). At the very most, all Green has is at best a textbook "mere scintilla" of evidence—which is of course insufficient to defeat a summary judgment motion. *D.E.W., Inc. v. Loc. 93, Laborers' Int'l Union of N. Am.*, 957 F.2d 196, 199 (5th Cir. 1992); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). So the majority is correct to affirm.

## II

Finally, a word about the theory underlying Green's arguments. Green's appellate briefing appears to comingle two distinct theories of discrimination—sex and race. In so doing, Green invokes the idea of "intersectional" Title VII and § 1981 claims. For those who are not steeped in the vernacular of Ivy League Gender Studies Departments, an "intersectional" claim imagines a plaintiff who was not discriminated against on the basis of any one protected category—but who somehow *was* discriminated against because of a mix of categories. So, for example, Green's appellate briefing suggests that she might not have been discriminated on the basis of race *or* sex—but she somehow was discriminated against on the basis of her combined race *and* sex.

This sort of intersectional argument should fail. For one, § 1981 does not cognize intersectional claims, since it applies only to racial discrimination (and not sex discrimination). *See Bobo v. ITT, Cont'l Banking Co.*, 662 F.2d 340, 342–43 (5th Cir. 1981). So any attempt to rely on such arguments in the context of § 1981 fails. As to Title VII, this court has looked favorably on intersectional claims. *See Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980). But other courts have disagreed. *See Degraffenreid v. Gen. Motors Assembly Div.*, 413 F. Supp. 142, 143 (E.D. Mo. 1976), *aff'd in part*, *rev'd in part*, 558 F.2d 480 (8th Cir. 1977).

No. 24-20554

The skeptics have the better reading of Title VII. That statute prohibits discrimination based on "race, color, religion, sex, *or* national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Notably, it does not grant a separate cause of action to people suing because (1) the employer did not discriminate on the basis of sex, (2) did not discriminate on the basis of race, but (3) somehow did discriminate on the basis of a *mix* of those traits. *See ibid.*[*]

Intersectional theory is also, well, under-theorized. For one, the notion of intersectionality did not emerge until twenty-five years after Congress enacted Title VII. And even then, black feminist theorist Kimberlé Crenshaw (who coined the term "intersectionality") criticized the prevailing interpretation of Title VII for failing to accommodate so-called intersectional discrimination. Kimberlé Crenshaw, *Demarginalizing the Intersection of Race and Sex: A Black Feminist Critique of Antidiscrimination Doctrine, Feminist Theory and Antiracist Politics*, 1989 U. Chi. Legal F. 139, 139–50 (1989). Crenshaw claimed that the focus on categories helps only those it was designed for (supposedly, white women and black men) and thereby marginalizes black women, and "guarantees that their needs will seldom be addressed." *Id.* at 150. Other scholars followed. Peggie Smith, for example,

---

[*] What's more, in the usual Title VII case, employers face no liability when they replace the plaintiff employee with an employee of the same protected characteristic. But under an intersectional theory, that employer defense often turns into a sword for plaintiffs: Employers would have to find a replacement matching the exact intersectional combo of the fired employee. And that in turn puts employers in a Catch-22: Face an intersectional Title VII suit or violate Title VII by taking affirmative steps to reject qualified applicants until you find the "right" intersectional combo that matches the would-be plaintiff. *See* Oral Arg. at 13:26–14:05 (Q: "If your theory of Title VII puts HCTech in a position where the only way to avoid a trial . . . in a Title VII suit under these facts is to replace her with a similarly intersectional new employee, doesn't that itself violate Title VII? Because they are making decisions on the basis of enumerated characteristics. They are hiring a new person because of their intersectional race and sex?").

suggested that Title VII's single-issue framework "fails to recognize that racism and sexism interact inextricably to harm [b]lack women." *See* Peggie R. Smith, *Separate Identities: Black Women, Work and Title VII*, 14 Harv. Women's L.J. 21, 23 (1991); *see also* Yvette N. Pappoe, *The Shortcomings of Title VII for the Black Female Plaintiff*, 22 U. Pa. J.L. & Soc. Change 1, 3 (2019).

It's thus too late in the day to pretend that intersectionality's founders were wrong to say the theory cannot be squared with Title VII. It would be quite something to say that a theory founded on the statute's alleged deficiencies was somehow embedded in the statute all along.

\* \* \*

I concur in the judgment.